## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-21910-CIV-MORENO/TORRES

YVIRA BAEZ,

      Plaintiff,

vs.

POTAMKIN HYUNDAI, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's Motion for Summary Judgment [D.E. 61] and Plaintiff's Motion for Partial Summary Judgment [D.E. 63], together with their respective responses and replies [D.E. 70, 74, 72 and 80].[1]  The Court has reviewed the motions, responses, replies, relevant authority, supplemental filings and authority, and the record evidence submitted in support for or in opposition to the motions.  Based upon a thorough review of the record, we find that there are no genuine issues of material fact to preclude entry of final summary judgment in favor of Defendant and against Plaintiff.

### *I.  BACKGROUND*

The facts of this case are largely undisputed.  On July 19, 2008, Plaintiff Yvira Baez ("Plaintiff") attempted to purchase and finance a new 2008 Hyundai Santa Fe

---

[1] The Honorable Federico A. Moreno referred this case to the undersigned for a Report and Recommendation on any dispositive matters.  [D.E. 20].

("Vehicle") from Defendant Potamkin Hyundai, Inc. ("Defendant").[2]  In the course of their dealings, Plaintiff authorized Defendant to obtain a credit report that prompted the preparation of a Retail Installment Sales Contract ("RISC") and a Retail Buyer's Order ("Buyer's Order") (collectively "Vehicle Documents").  *See* [D.E. 24-2; D.E. 61-1, respectively].  Plaintiff agreed to a $3,000 down payment and executed the Vehicle Documents for the sale and financing of the Vehicle.

The RISC expressly disclosed the terms relating to down-payment, APR, finance charge, amount financed, total of payments, total sale price, number of payments, the amount of each monthly payment and when payments were due.  Moreover, the RISC clearly indicated that Defendant "assigns its interest in this contract to" J.P. Morgan Chase Bank, N.A.  ("JP Morgan").  Indeed, Defendant does not finance its vehicle sales and in this case, as in all other credit sales, it sought to locate a lender, such as JP Morgan, to finance the deal. *See* [D.E. 67, Larry Jackson Deposition ("Jackson Dep.") at p. 34:23-35:6].  Plaintiff admits that Defendant explained JP Morgan, and not Defendant, was financing the sale. [D.E. 85-1,2; Yvira Baez Deposition ("Baez Dep.") at p. 116:4-12;128:9-14].   In furtherance of her financing, Plaintiff admits that Defendant explained JP Morgan may request some additional information to verify her income. *Id.* at p. 56:24-57:23, 58:14-20.  Thus, while Plaintiff may have failed to fully appreciate Defendant's statements, she readily testified that Defendant explained financing was conditioned on JP Morgan verifying certain information.  *Id.*

---

[2] Defendant is a motor vehicle dealer located in Miami-Dade County.

After Plaintiff paid the down payment, she received and left with the Vehicle that same day.  This process, commonly known as "spot delivery," is one where the terms of the transaction have been agreed upon, but the financing has not received final approval.  The Vehicle Documents further elaborate on and explain this process.  For instance, the front of the RISC includes a separate provision, with its own signature block signed by Plaintiff, titled "Seller's Right to Cancel" that directs Plaintiff to a clearly identified, bold-bordered section on the back of the RISC.  This section reads, in pertinent part:

> Seller agrees to deliver vehicle to you on the date this contract is signed by Seller and you.  You understand that it may take a few days for Seller to verify your credit, locate financing for you on the exact terms shown on the front of this contract, and assign this contract to a financial institution. ... You agree that if Seller is unable to assign this contract within [30 days] to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable, Seller may cancel this contract. ... Upon receipt of [notice of cancellation], you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give you back all consideration Seller has received in accordance with the terms of the Retail Purchase Agreement or Buyers Order.  If you do not immediately return the vehicle, Seller may use any legal means to take it back (including repossession) and you will be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees... .

By its language, this section includes a "bailment" provision and expressly conditions the contract on: 1) financing approval; and, 2) assignment to a financial institution. Likewise, the Buyer's Order includes similar "bailment" language and qualifies this sale as a conditional transaction.  In the section titled "FINANCING NEGOTIATION

3

/APPROVAL, which also includes a separate signature line executed by Plaintiff, the

Buyer's Order reads, in pertinent part:

> The [RISC] to be entered between Dealer and Customer ...
> shall be immediately assigned by Dealer to a bank/finance
> company (at face value or greater) which shall then be the
> creditor to whom the Customer shall be obligated under the
> RISC. ... **Dealer may terminate this Order if Dealer
> cannot obtain credit approval for Customer or if
> Dealer is unable to sell the RISC to a financial
> institution on terms of no less than face value** (these
> acts shall be collectively referred to as "Financing
> Approvals"). Dealer's right of termination cannot be waived
> unless in writing. **Financing Approvals are not
> typically obtained at the time of the Vehicle's
> delivery and are beyond Dealer's control.** *Should
> Customer take delivery of the Vehicle prior to Dealer's
> obtaining the Financing Approvals, Customer understands
> and acknowledges that **pending the Financial
> Approvals, delivery of the Vehicle to Customer serves
> as a convenience to Customer only** and Customer does
> not have, nor will acquire, any rights or interest in the
> Vehicle by such delivery except Dealer's permission to use it,
> which permission can be revoked, requiring the Vehicle's
> immediate return to Dealer in the same condition as it
> existed when delivered to Customer.* Additionally, the
> obtaining of the Financing Approval is a **condition
> subsequent** to the enforcement and validity of the RISC
> which, at Dealer's option, shall be deemed null and void if
> such condition subsequent is not met. (italics in original,
> bold added).

Collectively, the Vehicle Documents, when read separately or together, include a

"bailment" provision that permits Plaintiff to leave with the Vehicle "on the spot."

However, the Vehicle Documents also clearly explain that this is a conditional

agreement that is contingent on satisfaction of a condition subsequent of financing

approval and assignment before the contract is finalized.

4

On August 1, 2008, JP Morgan provided Defendant with a "Decision Notification" approving Plaintiff's credit and preliminarily approving financing on the exact terms set forth in the RISC executed by Plaintiff. [D.E. 86 at ¶ 10]. However, JP Morgan's approval was subject to verification of Plaintiff's employment and income. [D.E. 73-1 at p. 4]. In its "Decision Notification," JP Morgan requested, among other things, "proof of income" and, specifically, "custs income to verify// need both YTD paystubs." *Id.* Plaintiff provided purported bank statements and pay stubs directly to JP Morgan to verify her income.

Thereafter, Defendant informed Plaintiff there was a problem with her financing and, more specifically, that JP Morgan denied financing because Plaintiff provided fraudulent documents to substantiate her income. [D.E. 73-1, Affidavit of Larry Jackson ("Jackson Aff.") at ¶ 7]. According to Defendant, the documents Plaintiff provided to JP Morgan were unable to be verified and were ultimately deemed by JP Morgan to be fraudulent or otherwise inaccurate documents. Indeed, Plaintiff admits the documents she provided were inauthentic pay stubs designed to look like real pay stubs issued by her employer that purported to correspond with (and therefore substantiate) various deposits listed on her bank statements.[3] Baez Dep. at pp. 93-108.

---

[3] Plaintiff argues that Defendant's explanation that JP Morgan denied financing due to Plaintiff's fraud is based on inadmissible hearsay statements. Normally, we cannot rely on such statements when considering a summary judgment motion. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). Because Plaintiff admits to the fraudulent conduct, however, we conclude Plaintiff sufficiently corroborates JP Morgan's hearsay statements to warrant their consideration. *See, e.g., Cooper v. Miami-Dade County*, No. 01-976-CIV-JORDAN, 2004 WL 2044288, at *8 (S.D. Fla. July 9, 2004) (hearsay statement corroborated by other admissible evidence).

Ultimately, Plaintiff admits that her fraudulent pay stubs were intended to give the appearance of direct deposits evincing her purported total sum of income received from various sources (including, but not limited to, Air Trans Marine the employer listed on Plaintiff's unauthentic pay stubs). *Id.* In fact, Plaintiff did not actually receive any direct deposit payments from Air Trans Marine; instead, Plaintiff manufactured the documents by using her employer's letterhead. *Id.* at 97:23-25. Because the documents provided by Plaintiff to JP Morgan were unverifiable or inaccurate, JP Morgan denied Plaintiff's financing. *See* Jackson Aff. at ¶¶ 7-8. Thereafter, Defendant repossessed the Vehicle from Plaintiff's new address in North Carolina. Defendant never issued Plaintiff an adverse action notice.

The Second Amended Complaint contains five (5) counts:[4] Count I, Defendant violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; Count II, Defendant violated Florida's Motor Vehicle Retail Sales Finance Act ("MVRSFA"), Fla. Stat. § 520.07(1)(a),(2);[5] Count IV, Defendant violated the Equal Credit Opportunity

---

[4] The Court dismissed Count III. [D.E. 52].

[5] The Plaintiff repeatedly cites to § 520.07(2)(e); we assume Plaintiff intended to cite to this language in § 520.07(2):

> Except for the requirement in subsection (3) that a separate written itemization of the amount financed be provided, a contract which complies with the federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, or any accompanying regulations shall be deemed to comply with the provisions of this subsection and subsection (3). However, in any proceeding to enforce the provisions of this section, the burden of alleging and proving compliance with the federal Truth in Lending Act shall be on the party claiming compliance.

Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*; Count V, Defendant violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*; Count VI, Defendant violated Article IX of Florida's Uniform Commercial Code ("UCC"), Fla. Stat. § 679.1011 *et seq.*

Defendant moves for final summary judgment and Plaintiff moves for partial summary judgment (liability only) on all counts asserting that there is no genuine dispute of fact to preclude entry of summary judgment as a matter of law in their respective favors. Broadly speaking, Plaintiff contends that Defendant constructs its vehicle sales, including the sale to Plaintiff, in such a fashion that each sale violates various federal and state statutes. Defendant, however, maintains that the contractual structure facilitating Plaintiff's sale, like all of its sales, is permissible and, when applied to these facts, complies with all applicable federal and state statutes.

## II.  ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers or other materials; or showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at

56(c)(1), (e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Gonzalez v. Lee County Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "In determining whether summary judgment is appropriate, the facts and inferences from the facts are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine material fact and that it is entitled to judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

However, the existence of a "scintilla" of evidence in support of the non-movant's position is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Young v. City of Palm Bay, Fla.,* 358 F.3d 859, 860 (11th Cir. 2004). Likewise, a court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Matsushita*, 475 U.S. at 592-94; *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). Speculation or conjecture from a party cannot create a genuine issue of material fact. *Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005).

### A.   *Count I - Truth in Lending Act*

Count I asserts that Defendant violated the TILA, a consumer protection statute that "is remedial in nature and therefore must be construed liberally in order to best serve Congress' intent." *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th

Cir. 1998) (citing *McGowan v. King, Inc.*, 569 F.2d 845, 848 (5th Cir. 1978)).[6] The purpose of the TILA, in relevant part, is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601. Courts interpreting the TILA must defer to the regulations developed by the Federal Reserve Board under the broad authority granted to it by Congress under the Act. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980); *Sage v. Freedom Mortgage Co.*, 704 F.2d 1519, 1521 (11th Cir. 1983). Pursuant to this authority, the Federal Reserve Board adopted 12 C.F.R. § 226.1 *et seq.* ("Regulation Z") to implement the TILA. Both the TILA and Regulation Z require a creditor, in transactions other than an open end credit plan, to disclose terms such as: the identity of the creditor, the amount financed, the finance charge, the annual percentage rate, the total of payments, the payment schedule, and the total sale price. Regulation Z also provides that these disclosures must be made "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1).

It is undisputed that the disclosures made in Plaintiff's RISC satisfied TILA's requirements for content. However, Plaintiff contends that the terms of the RISC purporting to condition the agreement on financing approval or an assignment of the RISC to a third-party render the TILA disclosures illusory. Plaintiff maintains the

---

[6] This Court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

transaction was consummated when she signed the RISC and that Defendant's failure to honor those terms, by unilaterally cancelling the agreement, violated the TILA. Defendant contends, however, that the RISC was not illusory because the parties were bound by its terms until, and if, Defendant cancelled the RISC due to Defendant's inability to satisfy the RISC's condition subsequent of obtaining financing and assigning the RISC to a third-party creditor (here, JP Morgan).  Defendant's position rests on the fact that the Vehicle Documents evince a valid contract subject to a condition subsequent: if financing is secured or the RISC is assigned, then the contract is binding on both parties; if not, seller may cancel, and the contract is void.

Without question, the TILA is triggered upon "consummation" and this occurs when Plaintiff executed the RISC. *See Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1068 (11th Cir. 2004) (when an agreement's condition of obtaining third-party financing is within the exclusive control of the seller and third-party lender consummation occurs when plaintiff-buyer signs the agreement); *Hunter v. Bev Smith Ford, LLC*, No. 07-80665-CIV, 2008 WL 1935265, at *3 (S.D. Fla. Apr. 28, 2008) ("consummation occurs upon the purchaser's signature of the RISC or sales contract"), *aff'd*, 353 Fed App'x 218 (11th Cir. 2009) (affirming the district court's order  of dismissal after concluding appellant's arguments were "without merit"); *Muro v. Hermanos Auto Wholesalers, Inc.*, 514 F. Supp. 2d 1343, 1349-50 (S.D. Fla. 2007) (same).  However, Plaintiff maintains that Defendant's option to cancel the contract if it cannot secure financing or assign the contract (i.e. predicating the RISC on a

10

condition subsequent) renders the RISC illusory and violates TILA. We find Plaintiff's position unavailing and soundly rejected by courts under similar facts.

Under Florida law, the "use of conditional sales contracts in the motor vehicle sales industry," is permissible. *See King v. King Motor Co. of Fort Lauderdale, Inc.*, 900 So. 2d 619, 623 (Fla. 4th DCA 2005) (citing *Dodge City, Inc. v. Byrne*, 693 So. 2d 1033, 1035 (Fla. 2d DCA 1997) (where buyers executed several documents in a spot-delivery transaction, the court concluded that "[w]hen the contracts are read together it is clear that the buyers agreed to return the vehicle to Dodge City if the dealership could not find financing with an outside lender")).

Moreover, courts have upheld spot-delivery transactions when, like here, the RISC includes bailment language and explicitly indicates that the contract (and, thus, the TILA disclosure) is contingent on financing approval and assignment. *See Bragg*, 374 F.3d at 1067-68 (discussing a motor vehicle financing agreement containing a condition subsequent of obtaining financing); *Chastain v. N.S.S. Acquisiton Corp.*, No. 08-81260-CIV, 2009 WL 1971621, at *4 (S.D. Fla. July 8, 2009) (noting that "there is nothing in TILA or Regulation Z which prohibits financing contingencies in consumer contracts as violative of the TILA . . . "), *aff'd*, 378 Fed. App'x. 983 (11th Cir. 2010); *Hunter*, 2008 WL 1925265, at *4 (finding that a contract for the purchase of a motor vehicle subject to a condition of obtaining financing is permitted by law); *Muro*, 514 F. Supp. 2d at 1350 ("emphasizing that this decision does not prevent car dealerships . . . from conditioning car sales on the later acceptance of a potential buyer's credit"); *see*

*also Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 769 (7th Cir. 2000) (discussing a legal spot-delivery agreement where a consumer enters a low-interest rate sales contract, while the seller knows the consumer will not qualify for that rate, then the seller delivers the vehicle to the consumer and accepts a down payment, and finally the seller notifies the consumer that financing has been denied and they must enter into a new contract).  Thus, these courts conclude that an installment contract, with TILA disclosures, that includes conditional sale and bailment language conforms with the federally mandated consumer protection safeguards imposed by the TILA.

An opposite conclusion can be drawn when a fully integrated installment contract or RISC indicates that the agreement is binding on the parties when executed and nothing in the agreement makes it contingent on financing approval or assignment to a third party.  *See, e.g., Bragg,* 374 F.3d at 1067 (reversing motion to dismiss regarding a RISC contract sale without including any contingent sale or bailment language); *Muro*, 514 F. Supp. 2d at 1350 (granting summary judgment in Plaintiff's favor under similar agreement language as *Bragg*); *see also Salvagne v. Fairfield Ford, Inc.*, No. 1:09-CV-00324, 2010 WL 3292967, at *6 (S.D. Ohio Aug. 19, 2010) (granting summary judgment on TILA and rejecting defendant's argument that contemporaneously executed documents should be read into the RISC because the RISC was fully integrated and thus barred inclusion of the conditional sale language;

without such language, the RISC violated the TILA);[7] *see also Patton v. Jeff Wyler Eastgate, Inc.*, 608 F. Supp. 2d 907, 914 (S.D. Ohio 2007) (same).

Indeed, because TILA is a remedial consumer protection that is to be construed liberally, courts have strictly construed vehicle sale and financing contracts to exclude conditional language when not explicitly included in the contract. *See Bragg; Muro; Salvage;* and, *Patton.*  In *Bragg,* the Eleventh Circuit reversed dismissal of a TILA claim because the fully integrated RISC was devoid of conditional language. *Bragg*, 374 F.3d at 1067.  Furthermore, *Bragg* rejected the district court's reliance on separate language found in the purchase and bailment contracts to read conditional language into the RISC agreement opining that, "[t]he RISCs provided simply, '[b]y signing this contract, you choose to buy the vehicle under the agreements on the front and back of this contract'; they did not refer explicitly to the Purchase Contract or any other document containing a condition precedent." *Id.* (citations omitted).  Hence, when faced with a fully integrated installment contract, courts reject the dealership's

---

[7] Plaintiff cites to *Salvagne* in support of her argument maintaining that *Salvagne* reached the appropriate conclusion as opposed to, for instance, *Chastain* with regard to the TILA claim.  Notably, however, *Salvagne* specifically distinguishes its conclusion from *Chastain* explaining the contracts presented to the respective courts are "significantly different" and that the *Chastain* contract "itself contained a section that notified the consumer that the deal was conditioned on the seller's ability to assign the contract on the exact terms shown and that it could, if unable to do so, cancel the contract." *Salvagne*, 2010 WL 3292967 at *6 n.1. (citation omitted).  While the *Salvagne* court noted this difference, Plaintiff here fails to appreciate the significance of that footnote when relying on *Salvagne* and *Patton* for support.  With that language  in mind, and when applied to our facts, *Salvagne* and *Patton* actually support Defendant's, and not Plaintiff's, argument.

argument when it is predicated on a theory that various documents signed contemporaneously are merged into one document. *Id.*

Thus, from a strictly legal standpoint, the TILA issue turns on whether or not the subject installment contract includes: 1) the requisite TILA disclosures; and, 2) language that the agreement is contingent on financing approval and assignment of the contract.  Here, the RISC includes the requisite TILA disclosures and also expressly discloses that the agreement is a conditional sale contingent on financing approval and assignment of the RISC.  As such, we conclude the subject RISC comports with the TILA.

Obviously, however, if Plaintiff proffered evidence demonstrating that Defendant knowingly disclosed TILA terms on the RISC that it knew would be rejected by third party creditors in order to implement a "bait-and-switch" tactic to secure a better deal from Plaintiff, then Plaintiff could establish Defendant violated, or intended to violate, the TILA. *See, e.g., Muro*, 514 F. Supp. 2d at 1350.  As a consequence, we denied Defendant's motion to dismiss to allow Plaintiff an opportunity to flesh out her allegations.

Yet, the record on summary judgment belies such a conclusion.  In fact, JP Morgan initially approved the financing arrangement but requested verification of income from Plaintiff.  However, Plaintiff supplied inaccurate or inauthentic pay stubs to substantiate her income.  As a result, JP Morgan denied her financing.  Based on these salient facts, it is undisputed that Plaintiff offers no evidence to which we could even infer Defendant intended to defraud Plaintiff through a bait-and-switch tactic.

14

Accordingly, we conclude that there is no genuine dispute of fact to preclude entry of summary judgment in Defendant's favor on Count I as a matter of law.

### B.   *Count II - Florida's Motor Vehicle Retail Sales Finance Act*

In Count II, Plaintiff asserts a violation of Florida's MVRSFA.  Florida law provides that a RISC that complies with the TILA also complies with the MVRSFA, as long as it contains a separate written itemization of the amount financed. *See* Fla. Stat. § 520.07(2); *Cannon v. Metro Ford, Inc.*, 242 F. Supp. 2d 1322, 1333 (S.D. Fla. 2002). The Defendant, the party claiming TILA compliance, has the burden of proving compliance with the TILA. *See* Fla. Stat. § 520.07(2).  Here, the RISC contained a section itemizing the amount financed in compliance with MVRSFA.  Since we have already held no TILA violation occurred, the MVRSFA claim must also fail.  *See Chastain*, 2009 WL 1971621, at *5 (dismissing MVRSFA claim after ruling there was no TILA violation); *Hunter*, 2008 WL 1925265, at *4-5 (same).

### C.   *Count IV - Equal Credit Opportunity Act*

Congress passed this statute to provide some transparency to the process of credit transactions and to protect consumers from credit denials for discriminatory reasons. *See Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 977 (7th Cir. 2004); *Hunter*, 2009 WL 3818749, at *5.  In Count IV, Plaintiff asserts that Defendant took adverse credit action against the Plaintiff, but failed to provide the written notification required by the ECOA. *See* 15 U.S.C. § 1691(d); 12 C.F.R. § 202.9(a)(2). The Defendant contends, however, that written notification was not

required because it is not a creditor and, assuming that it was a creditor, Defendant did not take adverse action against Plaintiff that would require notification.  Moreover, Defendant asserts that assuming ECOA did apply, Count IV still fails because Plaintiff is unable to demonstrate either discrimination or discouragement, which is a necessary element of an ECOA claim.

To establish her claim, Plaintiff must prove that Defendant: 1) was a creditor; 2) took adverse action against Plaintiff; and, 3) failed to provide Plaintiff with an adverse action notice. *Meeks v. Murphy Auto Group, Inc.,* No. 8:09-cv-1050-T-TBM, 2010 WL 5174525, at *11 (M.D. Fla. Dec. 15, 2010); *Madrigal v. Kline Oldsmobile, Inc.*, 423 F.3d 819, 822 (8th Cir. 2005).

The notice requirements of the ECOA apply to "creditors" only, which includes people who regularly extend or arrange for the extension of credit and people who regularly participate in a credit decision, such as setting the terms of the credit.  *See* 15 U.S.C. § 1691a(e); 12 C.F.R. § 202.2(l).  The Federal Reserve Board elaborated that:

> [W]here the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit.  Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision—for example, where the dealer does not participate in setting the terms of the credit or making the credit decision—the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.

68 Fed. Reg. at 13155.  Thus, the Federal Reserve Board clarified that certain people who may be considered "creditors" for other ECOA purposes are *not* subject to the adverse notice requirement if they merely accept and refer credit applications. *Id.*  One court conceptualized this as "a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act."  *Bayard v. Behlmann Auto. Serv., Inc.*, 292 F. Supp. 2d 1181, 1186 (E.D. Mo. 2003).

The record before us establishes that Defendant falls more on the "creditor" side of the continuum.  However, because the record also establishes that Defendant's role was limited to accepting and referring applications for credit and selecting creditors (like JP Morgan) to whom applications were sent, Defendant is likely a creditor but limited for purposes of the prohibitions against discrimination and discouragement. *See Treadway,* 362 F.3d at 979-80 (noting that pursuant to 68 Fed. Reg. at 13155, a dealer may be considered a "creditor" for discrimination and discouragement purposes only); *Hunter*, 2008 WL 1925265, at *6 (dismissing ECOA claim because dealer did not provide financing and plaintiff made no allegation otherwise).

Indeed, Defendant proffered testimony that it "never" provides financing, a contention not rebutted in this record.  Moreover, Plaintiff acknowledged that JP Morgan was going to extend Plaintiff credit, rather than Defendant.  Plaintiff makes no showing that Defendant engaged in any conduct beyond referring credit applications

to third party creditors, akin to the "dealer" described in 68 Fed. Reg. at 13155 who is designated as a "creditor" under ECOA for the limited prohibition of discrimination or discouragement.  The RISC and Buyer's Order bolster this result because these documents make clear Defendant does not provide financing, "[y]ou understand that it may take a few days for [Defendant] to verify your credit, *locate financing for you* on the exact terms shown on the front of this contract, and assign this contract to a financial institution," *see* RISC, and "the [RISC] ... shall be immediately assigned by [Defendant] to a bank/financing company ... which *shall then be the creditor* to whom [Plaintiff] shall be obligated under the RISC." *See* Buyer's Order. (emphasis added). Therefore, we find the record tends to show that Defendant is a "creditor," but due to its limited role Defendant is only liable under the ECOA if Plaintiff alleges, and then proves, either discrimination or discouragement.  Here, however, Plaintiff has failed to do so.

However, assuming *arguendo* that Defendant is indeed a "creditor" under the ECOA, we would still reject Plaintiff's argument because Plaintiff offers no evidence that Defendant denied Plaintiff credit and, thus, took adverse action against Plaintiff. *See Meeks*, 2010 WL 5174525, at *11 (declining to decide the "creditor" issue but granting summary judgment in defendant's favor based on plaintiff's failure to establish any "adverse action").

Previously, we concluded Plaintiff pled a valid claim under the ECOA based on the allegations that: 1) her credit was revoked by the Defendant; 2) at the outset the

Defendant had no intention of assigning the RISC to a third-party; and, 3) any rejection or revocation of credit is Defendant's decision alone because in spot-delivery transactions it is never a third-party who makes the credit decisions on the RISC. *See* [D.E. 47 at p. 15-16]. After completing discovery, however, Plaintiff is unable to support any of her allegations of "adverse" action. Rather, the undisputed record demonstrates the exact opposite, and that: 1)Plaintiff's credit was "revoked" by JP Morgan; 2) Defendant attempted to assign Plaintiff's RISC to JP Morgan; and, 3) JP Morgan made the credit decision, not the Defendant "alone." Thus, even if Defendant was a creditor required to give notice under the ECOA, Defendant did not take the requisite adverse action against Plaintiff to then impose a corresponding ECOA notice requirement.

Because Plaintiff fails to demonstrate that Defendant is a "creditor" under ECOA and, more importantly, because there is no evidence of any "adverse action" by Defendant, the ECOA claim must fail. Therefore, we conclude that there is no genuine dispute of fact to preclude entry of summary judgment in Defendant's favor on Count IV as a matter of law.

### D.   *Count V - Florida's Deceptive and Unfair Trade Practices Act*

The FDUTPA broadly declares unlawful any unfair, unconscionable, or deceptive act committed in the conduct of any trade or commerce. Fla. Stat. § 501.204(1). While there is no definition of an "unfair or deceptive act," the Legislature mandated that the FDUTPA be liberally construed to protect the consumer and that great weight should be given to federal cases interpreting the federal counterpart of this Act. *See* Fla. Stat.

§§ 501.202, 501.204(2); *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001) (citing *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451 (Fla. 1st DCA 1985)). Under the federal counterpart of this Act, a practice is unfair when it "offends established public policy," and is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976).

Plaintiff asserts that the various allegations contained in her Second Amended Complaint equate to deceptive, unfair or otherwise illegal practices and, therefore, this affords Plaintiff remedies under FDUTPA. *See* [D.E. 63 at p. 13]. However, since we have already considered and rejected Plaintiff's arguments as legally deficient and factually unsupported, we likewise find that Plaintiff's FDUTPA claim fails too.

Broadly speaking, Count V, like the rest of Plaintiff's pleading, advances the argument that Defendant's sale procedure constitutes intentional fraud because it is a "bait-and-switch" scheme. When previously considering this matter on Defendant's motion to dismiss, we concluded Plaintiff sufficiently pled a FDUTPA claim based on the following allegations: 1) the Defendant represented to the Plaintiff that credit was extended via the RISC, 2) the Defendant inserted illusory TILA disclosures knowing that it would revoke these terms with no intention of assigning the RISC to a third-party, 3) the Defendant intended to lead Plaintiff to believe that the deal was completed in order to take the Plaintiff out of the car-buying market, 4) the Defendant delivered the Vehicle to the Plaintiff before extending credit in furtherance of Plaintiff's beliefs that the deal was completed, 5) the Defendant intended to change the

RISC terms to its advantage, i.e. demand a higher down payment, increase the interest rate, etc., on the false representation that there was a problem with the Plaintiff's financing, when in reality the Defendant itself rejected the credit application *ab initio*, and 6) the Defendant then repossessed the Vehicle and kept the Plaintiff's down payment. [D.E. 27 ¶¶ 17-33, 68-69]; [D.E. 27-2 ¶¶ 6,7,12].

Plaintiff has failed to demonstrate any of these allegations to support her purported "bait-and-switch" scheme. Significantly, the undisputed record and Plaintiff's own testimony belie such a finding. To be sure: 1) credit was extended to Plaintiff under the RISC on the condition of financing approval as permitted under law; indeed, Plaintiff acknowledged this during her deposition; 2) Defendant attempted to assign the RISC to JP Morgan who preliminarily approved financing and accepted the assignment pending verification of Plaintiff's income; 3) Plaintiff admitted that Defendant told her JP Morgan may need to verify her income thus Plaintiff acknowledged the conditional nature of the transaction; 4) Defendant delivered the Vehicle to Plaintiff pursuant to the bailment agreement and conditional sale language clearly disclosed in the RISC; and, 5) Plaintiff proffers no evidence to support the conclusory allegation that Defendant intended to change the RISC terms to its advantage *ab initio* because ultimately JP Morgan, and not the Defendant, denied Plaintiff's financing after Plaintiff provided inaccurate and unauthentic pay stubs.

With this record in mind, we find Plaintiff cannot demonstrate that Defendant's acts or practices were unfair, immoral, unethical, oppressive, unscrupulous or otherwise offensive to public policy for purposes of establishing a FDUPTA claim. *See*

*Jones v. TT of Longwood, Inc.*, No: 6:06-cv-651-Orl-19DAB, 2007 WL 2298020, at *7 (M.D. Fla. Aug. 7, 2007) (granting summary judgment in defendant's favor on a FDUTPA claim where, like here, the installment contract clearly included conditional sale and bailment language permitting seller to cancel the contract and repossess the vehicle); *see also Chastain*, 2009 WL 1971621, at *8 (citing to *Jones* and dismissing a FDUTPA claim upon a finding that the installment contract did not offend public policy).  Accordingly, we conclude that there is no genuine dispute of fact to preclude entry of summary judgment in Defendant's favor on Count V as a matter of law.

### E.   *Count VI - Florida's Uniform Commercial Code*

Count VI asserts that Defendant ignored its contractual obligations in violation of multiple sections of Article IX of Florida's version of the UCC. Fla. Stat. § 679.1011 *et seq*.  In its motion, Plaintiff argues summary judgment is warranted because "defendant could not repossess Ms. Baez's new car unless she was in default of the contract, and then defendant by law could only proceed under the RISC's default provisions."  In response, Defendant contends this claim fails fail as a matter of law because Plaintiff proffers no evidence establishing a creditor-debtor relationship. More specifically, because JP Morgan denied financing causing Defendant to cancel the RISC, there was no "secured creditor" or "consumer debtor" to trigger Florida's UCC provisions.  Further, Defendant recovered the Vehicle pursuant to the "bailment" provisions of the Vehicle Documents that permitted recovery of the Vehicle if the RISC was cancelled.

22

In *Muro,* the court considered and accepted a buyer-plaintiff's argument that seller-defendant violated Florida's UCC because the RISC specifically included UCC provisions *and* was otherwise devoid of conditional sale or financing contingent language. *See Muro*, 514 F. Supp. 2d at 1352 (granting summary judgment in favor of plaintiff on Florida UCC claim after determining "the transaction was clearly a consumer-goods transaction" and an automobile purchase rather than a conditional sale contingent on financing).

Here, however, the underlying facts and RISC are distinguishable from *Muro*. Admittedly, Plaintiff's RISC also included UCC language, however, because Defendant cancelled the RISC pursuant to the conditional sale language this point is irrelevant.[8] Indeed, unlike *Muro*, Plaintiff's RISC and Buyer's Order *clearly* speak in terms of a conditional sale contingent on financing and assignment, rather than an absolute automobile purchase.  Moreover, unlike *Muro*, Plaintiff is unable to offer any evidence that after repossession of the Vehicle, Defendant treated the transaction as a sale by seeking the remaining balance of the RISC. *Compare id.* at 1352.   Because the transaction here was *not* a consumers-good transaction and there was no "secured creditor" or "consumer debtor," the provisions of § 679.1011 *et seq.,* generally, and the notice provision of Fla. Stat. § 679.611, specifically, did not apply.  Accordingly, we

---

[8] The RISC clearly states that Plaintiff would give the Defendant a security interest in the Vehicle in order to secure payment and other agreements under the contract.  However, Defendant cancelled the RISC pursuant to the "Seller's Right to Cancel" provision and, therefore, the UCC language is inoperative.

conclude there is no genuine dispute of fact to preclude entry of summary judgment in Defendant's favor on Count VI as a matter of law.

### III.  CONCLUSION

Plainly, Plaintiff fails to demonstrate either a legal or factual basis to support her claims.  Thus, for the foregoing reasons, it is hereby **RECOMMENDED** as follows:

1.     Defendant's Motion for Final Summary Judgment [D.E. 61] should be **GRANTED** and judgment entered in Defendant's favor on all counts.

2.     Plaintiff's Motion for Partial Summary Judgment [D.E. 63] should be **DENIED** and Plaintiff's Second Amended Complaint should be **DISMISSED WITH PREJUDICE**.

3.     The Clerk should be directed to CLOSE this action and all pending motions should be **DENIED AS MOOT**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, Chief United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 14th day of June, 2011.

*/s/    Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge